ENGELMAN IRRIGATION
DISTRICT, Petitioner,

v.

SHIELDS BROTHERS,
INC., Respondent

No. 15-0188

Supreme Court of Texas.

Argued December 7, 2016

OPINION DELIVERED: March 17, 2017

Ramon G. Viada III, Viada & Strayer, The Woodlands, for Amici Curiae Texas Association of School Boards Legal Assistance Fund, Texas City Attorneys Association and Texas Municipal League.

Roger W. Hughes, Scott T. Clark, Adams & Graham, L.L.P., Harlingen, for Petitioner.

David E. Wood, Law Office of David E. Wood, McAllen, for Respondent.

Justice Willett delivered the opinion of the Court.

In this appeal, a governmental entity asks the Court to declare void a decades-old final money judgment on grounds that the law has changed regarding the entity's sovereign immunity.[1] The marquee issue, on the periphery in several of our recent immunity cases, is now squarely presented: Must courts equate sovereign immunity with a lack of subject-matter jurisdiction for all purposes? More specifically, does our decision in *Tooke v. City of Mexia* (that statutory "sue and be sued" language is insufficient to waive immunity)[2] apply narrowly only to judgments still being challenged on direct appeal or broadly to *all* prior judgments, thus permitting collateral attack of long-ago final judgments?

All things, even litigation, must come to an end.[3] This quarter-century-old dispute has run its course.

Favoring finality over uncertainty, we affirm the judgment of the court of appeals.

## I. Background

In 1992, Shields Brothers, Inc. sued the Engelman Irrigation District, a governmental entity, alleging Engelman had breached a contract to deliver water to Shields. Engelman contended the trial court lacked subject-matter jurisdiction because Engelman had governmental immunity. In response, Shields relied on *Missouri Pacific Railroad Co. v. Brownsville Navigation District*, where we held that statutes providing a governmental entity may "sue and be sued" effected a waiver of sovereign immunity.[4] The 275th District Court of Hidalgo County denied Engelman's immunity defense, and the case proceeded to trial. The jury found damages for lost profits. In 1995, the trial court rendered judgment for Shields in the amount of $271,138.80, along with interest and attorney fees. Engelman appealed this judgment (the *Engelman I* judgment), and in 1997 the court of appeals affirmed.[5] Addressing Engelman's

---

1. For convenience, our references to "sovereign immunity" refer to the related doctrines of sovereign immunity and governmental immunity. *See City of Hous. v. Williams*, 353 S.W.3d 128, 134 n.5 (Tex. 2011) (explaining that governmental immunity protects political subdivisions of the State).

2. 197 S.W.3d 325 (Tex. 2006).

3. *See* Geoffrey Chaucer, *Troilus and Criseyde*, (Book III, line 615).

4. 453 S.W.2d 812, 813 (Tex. 1970).

5. *Engelman Irrigation Dist. v. Shields Bros.*, 960 S.W.2d 343, 347 (Tex. App.—Corpus Christi 1997, pet. denied).

sovereign-immunity defense, the court of appeals cited *Missouri Pacific* and held that a then-applicable Water Code provision stating that water districts may "sue and be sued" [6] waived Engelman's immunity.[7] We denied review of *Engelman I* in 1998,[8] and the judgment became final.

But Engelman did not pay the *Engelman I* judgment.[9] Beginning in 1999, Engelman sought authorization to file for bankruptcy under provisions of the Water Code. The authorization was denied by the Texas Commission on Environmental Quality and later by the 98th District Court of Travis County. In 2008, TCEQ's administrative decision was affirmed by the court of appeals in what we will call *Engelman II*.[10] The *Engelman I* judgment remained unpaid.

In 2006, while *Engelman II* was on appeal, we decided *Tooke v. City of Mexia*,[11] which overruled *Missouri Pacific*'s holding that "sue and be sued" language waived immunity.[12] The court of appeals in *Engelman II* expressly did not consider the effect of *Tooke* on the *Engelman I* judgment.[13]

In 2010, Engelman brought the pending suit, *Engelman III*, in the 93rd District Court of Hidalgo County. Engelman sought a declaratory judgment that the

*Engelman I* judgment was void under *Tooke*. Shields filed a counterclaim asking the court to order Engelman's board of directors to levy, assess, and collect taxes to pay the *Engelman I* judgment. The trial court severed the counterclaim and rendered judgment denying Engelman's claim for declaratory relief. Engelman appealed this judgment, the *Engelman III* judgment. The court of appeals affirmed,[14] concluding the *Engelman I* "judgment is not void and may not be attacked collaterally, notwithstanding the holding in *Tooke*." [15]

Engelman now argues to us, in this appeal of the *Engelman III* judgment, that it is entitled to relief from the *Engelman I* judgment. Engelman contends that *Tooke* should be applied retroactively, and that under sovereign-immunity law as explicated in *Tooke*, Engelman was always immune from Shields's breach-of-contract claim. Engelman argues that its immunity deprived the trial court in *Engelman I* of subject-matter jurisdiction, thus voiding the *Engelman I* judgment.

## II.  Discussion

### A.  Retroactivity and Res Judicata

■  A judicial decision generally applies retroactively.[16] This general rule applies to

**6.**  TEX. WATER CODE § 58.098, *repealed by* Act of May 25, 1995, 74th Leg., R.S., ch. 715, § 47, 1995 Tex. Gen. Laws 3755, 3803. Section 58.098 was replaced by section 49.066.

**7.**  960 S.W.2d at 348.

**8.**  *Engelman Irrigation Dist. v. Shields Bros., Inc.*, 989 S.W.2d 360 (Tex. 1998) (per curiam).

**9.**  However, the briefs indicate that Shields assigned one-sixth of the judgment to a shareholder, who in turn assigned this interest to a bank. Engelman then purchased this interest from the bank at a discount.

**10.**  *Engelman Irrigation Dist. v. Tex. Comm'n on Envtl. Quality*, 251 S.W.3d 184, 188 (Tex. App.—Austin 2008, no pet.).

**11.**  197 S.W.3d 325 (Tex. 2006).

**12.**  *Id.* at 342.

**13.**  *Engelman II*, 251 S.W.3d at 193 n.6.

**14.**  —— S.W.3d ——, 2015 WL 233491 (Tex. App.—Corpus Christi 2015).

**15.**  *Id.* at ——.

**16.**  *Carrollton-Farmers Branch Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist.*, 826

*Tooke*. The Court in *Tooke* expressly disagreed with the dissent's view in that case that the decision should only apply prospectively.[17] We later retroactively applied *Tooke* to cases on appeal when *Tooke* issued, reversing judgments that had relied on the law prevailing prior to our decision.[18]

■ But retroactive application of a judicial decision does not generally extend to allow reopening a final judgment where all direct appeals have been exhausted.[19] For example, in *Sanchez v. Schindler*, we held a parent could recover mental-anguish damages under the Wrongful Death Statute, overruling caselaw to the contrary.[20] We held our decision would apply retroactively, but only to cases "still in the judicial process," such as cases "tried and on appeal" on the date of our decision.[21] We did not suggest that our decision could be applied retroactively to allow collateral attack on a final judgment. Similarly, in *Segrest v. Segrest*, a former husband sought a declaration that his final 1974 divorce decree dividing his military retirement benefits was unenforceable, after the United States Supreme Court held in 1981 that such benefits were not divisible as community property in state court. We held that principles of res judicata precluded the collateral attack on the final decree:[22] "That the judgment may have been wrong or premised on a legal principle subsequently overruled does not affect application of res judicata." [23]

There is nothing novel to Texas law in this regard. It is consistent with American law generally.[24] The United States Supreme Court has likewise held that a judicial decision does not apply retroactively to cases that have already proceeded to a final judgment. The Court has applied this rule to civil cases and to criminal habeas corpus actions, even where the change in the law is of constitutional significance.[25] It has recognized as a general rule that its decisions apply retroactively, but only to "cases still open on direct review." [26] "Of course, retroactivity must be limited by the need for finality; once suit is barred by res judicata or by statutes of limitation or repose, a new rule cannot reopen the door

S.W.2d 489, 515 (Tex. 1992); *Sanchez v. Schindler*, 651 S.W.2d 249, 254 (Tex. 1983).

17. *Tooke*, 197 S.W.3d at 346.

18. *E.g., Harris Cty. Hosp. Dist. v. Tomball Reg'l Hosp.*, 283 S.W.3d 838, 843 (Tex. 2009); *Abilene Hous. Auth. v. Gene Duke Builders, Inc.*, 226 S.W.3d 415, 416–17 (Tex. 2007) (per curiam).

19. Throughout our discussion, reference to a "final judgment" means one where the trial court has rendered a final judgment and all direct appeals have been exhausted.

20. 651 S.W.2d 249, 251 & n.2 (Tex. 1983).

21. *Id.* at 254.

22. 649 S.W.2d 610, 612 (Tex. 1983).

23. *Id.* (italics omitted).

24. "Once a court announces a new rule of law, the integrity of judicial review requires application of the new rule to all similar cases pending on review in which the issue had been preserved for appellate review, even if the decision constitutes a clear break with past precedent. Thus, generally, judicial decisions are applied retroactively to all civil matters that have not reached final judgment." 20 AM. JUR. 2D *Courts* § 149 (2016) (footnotes omitted).

25. *E.g., Chicot Cty. Drainage Dist. v. Baxter State Bank*, 308 U.S. 371, 376, 60 S.Ct. 317, 84 L.Ed. 329 (1940); *Teague v. Lane*, 489 U.S. 288, 310, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).

26. *Harper v. Va. Dep't of Taxation*, 509 U.S. 86, 97, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993).

already closed."[27]

■ The reason for not allowing collateral attack on a final judgment is that such an attack would run squarely against principles of res judicata that are essential to a rational and functioning judicial system. "Res judicata bars the relitigation of claims that have been finally adjudicated or that could have been litigated in the prior action."[28] The policies behind res judicata "reflect the need to bring litigation to an end, prevent vexatious litigation, maintain stability of court decisions, promote judicial economy, and prevent double recovery."[29] For any rational and workable judicial system, at some point litigation must come to an end, so that parties can go on with their lives and the system can move on to other disputes. We have recognized the "fundamental rule that it is the purpose of the law to put an end to litigation and expedite the administration of justice."[30] Or, as we stated in *Permian Oil Co. v. Smith*,

> The principle of res adjudicata is founded in public policy and is as old as English jurisprudence. Fundamentally its purpose is to expedite justice by putting an end to litigation; and to preserve the sanctity of the judgments of the courts by making them immune to collateral attack. Once a court has exercised its functions of decision on an issue over which it has jurisdiction, and that decision becomes final, the parties thereto and their privies cannot escape its binding effect. Lacking this anchorage of finality a judicial system would be little more than a rule of fiat. . . . It must be borne in mind that the purpose of the law remains constant to prevent the failure of justice as a result of permitting the retrial between the same parties or their privies of a cause of action or of an issue which has been finally disposed of.[31]

Ordinarily, therefore, a final judgment is the end point of litigation.

## B. Subject-Matter Jurisdiction and Sovereign Immunity

■ However, an element of res judicata is "a prior final judgment on the merits by a court of competent jurisdiction."[32] Under Texas law, res judicata does not apply when the first tribunal lacked subject-matter jurisdiction.[33] A judgment rendered without subject-matter jurisdiction is void and subject to collateral attack.[34]

■ Which leads us to the crux of this case. Engelman argues that its immunity from suit deprived the *Engelman I* trial court of subject-matter jurisdiction. Hence, the judgment in *Engelman I* is void and subject to collateral attack in the pending suit, *Engelman III*. We disagree.

It is true we have stated that sovereign immunity is a jurisdictional bar. For exam-

27. *James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, 541, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991) (announcing judgment of the Court) (citing *Chicot*).

28. *Igal v. Brightstar Info. Tech. Grp., Inc.*, 250 S.W.3d 78, 86 (Tex. 2008), *superseded by statute as recognized in Prairie View A&M Univ. v. Chatha*, 381 S.W.3d 500, 518 (Tex. 2012).

29. *Barr v. Resolution Tr. Corp.*, 837 S.W.2d 627, 629 (Tex. 1992).

30. *Stanolind Oil & Gas Co. v. State*, 136 Tex. 5, 145 S.W.2d 569, 570 (1940).

31. 129 Tex. 413, 107 S.W.2d 564, 567 (1937).

32. *Igal*, 250 S.W.3d at 86.

33. *Id.* at 82.

34. *In re United Servs. Auto. Ass'n*, 307 S.W.3d 299, 309 (Tex. 2010); *Alfonso v. Skadden*, 251 S.W.3d 52, 55 (Tex. 2008) (per curiam).

ple, we stated in a frequently cited decision, *Texas Department of Parks and Wildlife v. Miranda*, "In Texas, sovereign immunity deprives a trial court of subject matter jurisdiction for lawsuits in which the state or certain governmental units have been sued unless the state consents to suit." [35] But more recently, we have been more guarded in our description of the interplay of jurisdiction and sovereign immunity in three decisions: *Houston Belt & Terminal Railway Co. v. City of Houston*; [36] *Manbeck v. Austin Independent School District*; [37] and *Rusk State Hospital v. Black*. [38] We stated in these cases, quite deliberately, that sovereign immunity "implicates" the trial court's subject-matter jurisdiction. [39] We did not hold that sovereign immunity equates to a lack of subject-matter jurisdiction for all purposes or that sovereign immunity so implicates subject-matter jurisdiction that it allows collateral attack on a final judgment.

It is important to recognize the context of our statements in these cases. In *Houston Belt* and *Miranda*, we held that sovereign immunity concerns jurisdiction and therefore "is properly asserted in a plea to the jurisdiction." [40] In *Manbeck* and *Rusk*, we held that sovereign immunity implicated subject-matter jurisdiction and therefore immunity could be raised for the first time on appeal, under the rule that lack of subject-matter jurisdiction can be raised at any time in the proceeding. [41]

The issue before us has not been decided. In *Rusk*, we reached our holding "regardless of whether immunity equates to a lack of subject-matter jurisdiction for all purposes." [42] In making this qualification, we noted Justice Brister's concurrence in another case, to the effect that immunity may implicate, yet does not necessarily equate, to an absence of subject-matter jurisdiction, because "sovereign immunity includes concerns about both subject-matter and personal jurisdiction but is identical to neither." [43] Then-JUSTICE HECHT, concurring in *Rusk*, noted:

> [T]he Court does not equate immunity to a lack of subject-matter jurisdiction.... There are important differences between immunity from suit and lack of subject-matter jurisdiction. For one thing, the government can waive immunity from suit, either for broad classes of claims or on a case-by-case basis. But it cannot waive subject-matter jurisdiction.... For another, while a court is obliged to examine its subject-matter jurisdiction on its own in every case, we have never suggested that a court should raise immunity on its own whenever the government is sued. [44]

And JUSTICE LEHRMANN, concurring in *Houston Belt*, and concurring and dissenting in *Rusk*, warned against equating sovereign immunity and lack of subject-matter jurisdiction for all purposes, specifically flagging the result Engelman seeks today:

35. 133 S.W.3d 217, 224 (Tex. 2004).

36. 487 S.W.3d 154 (Tex. 2016).

37. 381 S.W.3d 528 (Tex. 2012).

38. 392 S.W.3d 88 (Tex. 2012).

39. *Hous. Belt*, 487 S.W.3d at 160; *Manbeck*, 381 S.W.3d at 530; *Rusk*, 392 S.W.3d at 95.

40. *Hous. Belt*, 487 S.W.3d at 160; *Miranda*, 133 S.W.3d at 226.

41. *See Manbeck*, 381 S.W.3d at 530; *Rusk*, 392 S.W.3d at 94.

42. *Rusk*, 392 S.W.3d at 95.

43. *Id.* (quoting *Reata Constr. Corp. v. City of Dall.*, 197 S.W.3d 371, 381 (Tex. 2006) (Brister, J., concurring)).

44. *Id.* at 102 (Hecht, J., concurring) (footnotes omitted).

"If sovereign immunity deprives the courts of subject matter jurisdiction, governmental entities could attack years-old judgments by asserting sovereign immunity because without subject matter jurisdiction, the judgments would be void." [45]

Holding that sovereign immunity so implicates subject-matter jurisdiction that the final judgment against Engelman can be challenged by collateral attack in a later proceeding would run counter to the trend of Texas law and of American jurisprudence generally. In *Dubai Petroleum Co. v. Kazi*, we interpreted a statute allowing certain injury claims by a foreigner if his country of citizenship has equal treaty rights with the United States. We held that this provision did not limit the trial court's subject-matter jurisdiction, and noted the modern trend followed in the Second Restatement of Judgments of "reduc[ing] the vulnerability of final judgments to attack on the ground that the tribunal lacked subject matter jurisdiction." [46] We repeated this observation in several later cases.[47] We noted one concern with labeling a requirement a matter of subject-matter jurisdiction is that "a judgment will never be considered final" [48] which "opens the way to making judgments vulnerable to delayed attack for a variety of irregularities that perhaps better ought to be sealed in a judgment." [49]

While the issue in *Dubai* was quite different from the one presented today, we find the analysis relevant. The Court recognized a trend toward limiting the characterization of a defense as jurisdictional, because such a label leaves final judgments open to perpetual collateral attack. The Court turned to and quoted the treatment of res judicata found in sections 11 and 12 of the Second Restatement of Judgments. Section 12 notes the "traditional doctrine was that a judgment of a court shown to have lacked subject matter jurisdiction was 'void,'" but adopts a "modern rule on conclusiveness of determinations of subject matter jurisdiction" that "gives finality substantially greater weight." [50] Under section 12, the general rule is this: "When a court has rendered a judgment in a contested action, the judgment precludes the parties from litigating the question of the court's subject matter jurisdiction in subsequent litigation." [51] We think that under the Restatement approach, res judicata would bar Engelman's effort to collaterally attack the *Engelman I* judgment.

■ This result is all the more compelled by two circumstances the Restatement recognizes. First, it indicates that section 12's general rule is particularly warranted where the issue of subject-matter jurisdiction was actually litigated in the first proceeding, as happened here. "When the question of the tribunal's jurisdiction is raised in the original action, in a modern procedural regime there is no reason why the determination of the issue should not thereafter be conclusive under the usual

**45.** *Id.* at 108 (Lehrmann, J., concurring and dissenting); *see also Hous. Belt*, 487 S.W.3d at 170 (Lehrmann, J., concurring).

**46.** 12 S.W.3d 71, 76 (Tex. 2000) (quoting Restatement (Second) of Judgments § 11 cmt. e (1982)).

**47.** *Chatha*, 381 S.W.3d at 511; *United Servs. Auto. Ass'n*, 307 S.W.3d at 306; *City of DeSoto v. White*, 288 S.W.3d 389, 393 (Tex. 2009); *Igal*, 250 S.W.3d at 83; *Hubenak v. San Jacin-* to Gas Transmission Co., 141 S.W.3d 172, 182 (Tex. 2004).

**48.** *Dubai*, 12 S.W.3d at 76.

**49.** *Id.* (quoting Restatement (Second) of Judgments § 12 cmt. b (1982)).

**50.** Restatement (Second) of Judgments § 12 cmts. a, b (1982).

**51.** *Id.* § 12.

rules of issue preclusion."[52] Second, it notes that even under the traditional doctrine courts were more willing to recognize finality where the first tribunal was a court of general jurisdiction. "The traditional rules regarding this problem made a distinction between courts of record and courts not of record or between courts of general jurisdiction and courts of limited jurisdiction. Judgments of courts of record or of general jurisdiction were presumed to have been based on proper subject matter jurisdiction."[53] Here, the *Engelman I* trial court was a district court, a court of general jurisdiction under Texas law.[54]

It is one thing to characterize sovereign immunity as jurisdictional so as to provide a defendant with certain procedural advantages in an ongoing case, such as avoiding a waiver of the defense or allowing a challenge of the immunity ruling by interlocutory appeal. In today's case, however, we are asked to jettison the foundational principle of res judicata, by allowing Engelman to reopen a final judgment that would otherwise operate as claim preclusion. We decline to allow this result. Such a result is not compelled by our precedent, and goes against the trend in our State and elsewhere of limiting the vulnerability of final judgments to attack on grounds that the trial court lacked subject-matter jurisdiction. Further, such a result undermines respect for the finality of judgments, an anchoring principle of any functioning and efficient judicial system.

## C. Finality and the Separation of Powers

Engelman devotes much of its briefing to arguing that we must apply *Tooke* retroactively because a contrary holding would offend separation-of-powers principles by denying the Legislature its authority to waive sovereign immunity. We are unpersuaded.

We have recognized that the decision to waive sovereign immunity is largely left to the Legislature.[55] The Restatement recognizes an exception to section 12's general rule precluding parties from relitigating subject-matter jurisdiction, where "[a]llowing the judgment to stand would substantially infringe the authority of another ... agency of government."[56] But we have also recognized that sovereign immunity is a common-law creation, and it remains the judiciary's responsibility to define the boundaries of the doctrine.[57]

In holding that the *Engelman I* judgment should not be reopened by collateral attack, we are not depriving the Legislature of its role in waiving sovereign immunity so much as we are deciding the effect of a final judgment rendered by the judiciary. Deciding the effect of a court judgment is, we think, very much a matter that should be left to the courts.

---

52. *Id.* § 12 cmt. c. *See also id.* § 12 cmt. a (noting that the modern rule gives less weight to finality "when the parties have not contested jurisdiction," as "in the case of a default judgment"). While the fact that the issue was actually litigated triggers an additional issue-preclusion hurdle to overcoming the final judgment, we do not mean to suggest that the claim-preclusion hurdle is not sufficient by itself.

53. *Id.* § 12 cmt. e. *See also id.* § 12 cmt. a (noting that modern rule gives less weight to finality "when the tribunal is one of limited legal capacity").

54. "A Texas district court ... is a court of general jurisdiction." *Dubai,* 12 S.W.3d at 75.

55. *See Tooke,* 197 S.W.3d at 332.

56. RESTATEMENT (SECOND) OF JUDGMENTS § 12(2) (1982).

57. *Brown & Gay Eng'g, Inc. v. Olivares,* 461 S.W.3d 117, 122 (Tex. 2015).

■ Indeed, even if the Legislature had itself, by statute, attempted to make *Tooke* retroactively applicable to final judgments, that decision might well violate separation-of-powers principles by interfering with a function properly left to the judiciary. For example, in *Plaut v. Spendthrift Farm, Inc.*, the United States Supreme Court held that Congress had flouted separation of powers by enacting a law that retroactively opened final judgments in certain securities lawsuits. The Court held that the law infringed on the power of the judicial branch to render dispositive judgments: "Judicial decisions in the period immediately after ratification of the Constitution confirm the understanding that it forbade interference with the final judgments of the courts." [58] Justice Scalia, writing for the Court, quoted Federalist No. 81: "A legislature without exceeding its province cannot reverse a determination once made, in a particular case; though it may prescribe a new rule for future cases." [59] Separation of powers "is violated when an individual final judgment is legislatively rescinded for even the *very best* of reasons, such as the legislature's genuine conviction (supported by all the law professors in the land) that the judgment was wrong." [60] In today's case, we are confident

that deciding the retroactive effect of one of our own decisions, on a prior final judgment rendered by a Texas court, is a matter properly left to the judicial branch under our Constitution.

## D. Equitable Considerations and the Public Interest

Engelman makes what is essentially a plea on the equities, arguing that allowing the *Engelman I* judgment to stand would compel an inequitable result that disserves the public interest. To some extent Engelman relies on section 28 of the Second Restatement of Judgments, providing exceptions to issue preclusion where "a new determination is warranted in order to take account of an intervening change in the applicable legal context or otherwise to avoid inequitable administration of the laws," or where "[t]here is a clear and convincing need for a new determination of the issue [ ] because of the potential adverse impact of the determination on the public interest." [61]

Section 28 of the Restatement offers exceptions to the general rule of issue preclusion found in section 27. Section 27, however, provides a general rule of issue preclusion, also known as collateral estop-

---

58. 514 U.S. 211, 223, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995).

59. *Id.* at 222, 115 S.Ct. 1447 (quoting THE FEDERALIST No. 81, at 545 (Alexander Hamilton) (J. Cooke ed. 1961)).

60. *Id.* at 228, 115 S.Ct. 1447 (emphasis in original). In this regard, we do not construe chapter 271 of the Local Government Code as applicable to this case, because the *Engelman I* judgment became final several years before the Legislature enacted chapter 271. Chapter 271, enacted in 2005, waives governmental immunity on certain contract claims. The statute is partially retroactive. Act of May 23, 2005, 79th Leg., R.S., ch. 604, § 2, 2005 Tex. Gen. Laws 1548, 1549; *see also Tooke*, 197 S.W.3d at 329, 344–45. Chapter 271, if appli-

cable, would not waive sovereign immunity on Shields's claim against Engelman because the jury only awarded damages for lost profits, and such damages are consequential damages that may not be recovered under the statute. *See* TEX. LOCAL GOV'T CODE § 271.153(b)(1); *see also Tooke*, 197 S.W.3d at 329–30, 346 (explaining that lost profits are consequential damages excluded from recovery under chapter 271). But we do not construe chapter 271 as operating on judgments such as the *Engelman I* judgment that became final years before the statute's enactment. Nothing in the Act's wording or our analysis in *Tooke* suggests otherwise.

61. RESTATEMENT (SECOND) OF JUDGMENTS § 28(2), (5) (1982).

pel, applicable to "an issue of fact or law" litigated in a prior case. Here, Engelman is not simply trying to relitigate the issue of sovereign immunity, but is trying to avoid the more foundational principle that a prior final judgment operates as res judicata on the *claims* of the parties. Engelman wants the Court to void the prior judgment itself and not merely permit relitigation of an *issue* that was previously litigated. Engelman must overcome claim and issue preclusion. If we rely on the Restatement, then as we read it, section 12 bars a subsequent challenge to the *Engelman I* court's subject-matter jurisdiction and the finality of that court's judgment.[62] Under Texas law, too, we conclude that the trial court in *Engelman I*, a court of general jurisdiction, had subject-matter jurisdiction to hear and decide the case before it. Later developments in the common law on sovereign immunity do not undermine the finality of the *Engelman I* judgment.

Further, recognizing the continuing validity of the *Engelman I* judgment is hardly so inequitable or contrary to the public interest as to compel abandoning principles of res judicata and allowing Engelman to avoid that judgment. Enforcing the prior judgment would simply mean that Engelman must answer for a breach of contract in damages[63] in the same manner a private party would have to respond. Requiring a party to comply with its contractual obligations, under the law prevailing at the time, does not strike us as a result so unfair as to demand an abdication of the ordinary rules of finality. We do not question the general need for the doctrine of sovereign immunity. We have recognized it as a doctrine of constitutional dimension and one based on the need to allow governments to perform their necessary functions.[64] But the doctrine has always submitted to exceptions and waivers.

## III. Conclusion

Sovereign immunity implicates a court's subject-matter jurisdiction, but their contours are not coextensive. This long-final judgment cannot be upended via collateral attack.

We affirm the judgment of the court of appeals.

---

**62.** We believe our analysis is consistent with a leading treatise on federal law. It finds section 12, comment c's reference to a "substantial change in the applicable legal context" as warranting application of section 28 "clearly sound as to relitigation of the same *issue* with respect to a *separate claim*." But "[i]f *judgment* is entered on *the claim* ... the values of res judicata seem so high that only the most extraordinarily compelling lack of jurisdiction should defeat the first judgment." 18A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE § 4428 at n.18 (2002) (emphases added).

**63.** In denying the petition for review in *Engelman I*, we issued a per curiam opinion expressing "no opinion on whether an irrigation district's obligation to deliver water under Chapter 58 of the Texas Water Code and related rules can be deemed a 'contract.'" *Engelman Irrigation Dist. v. Shields Bros., Inc.*, 989 S.W.2d 360, 360 (Tex. 1998) (per curiam). While we expressed reservations then as to whether Shields had a contract with Engelman, we think that issue has now been resolved by force of issue and claim preclusion. Shields sued for breach of contract and recovered under that theory.

**64.** *See, e.g., Harris Cty. Flood Control Dist. v. Kerr*, 499 S.W.3d 793, 804, 810 (Tex. 2016).